**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**STEVEN R. PRUITT,**

        **Plaintiff,**

**-vs-**                                            **Case No. 6:12-cv-1038-Orl-28GJK**

**DOUGLAS COTE, DAVID MONTFORT,**
**and THE CITY OF ORLANDO, FLORIDA,**

        **Defendants.**

## ORDER

    Steven R. Pruitt brings this case pursuant to 42 U.S.C. § 1983 against two City of Orlando police officers, Douglas Cote and David Montfort, alleging that the officers unlawfully arrested him and used excessive force against him in violation of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.[1]  Pruitt also brings claims of failure to protect and, against Cote only, state law claims of battery and false arrest.

    The case is now before the Court on the Motions for Summary Judgment (Docs. 48 & 49) filed by Defendants.[2]  Having considered the parties' submissions and arguments, the Court concludes that both motions must be granted.

---

[1] Pruitt also brought a constitutional claim against the City, but the Court granted the City's motion to dismiss that claim because Pruitt did not sufficiently plead a municipal policy or custom that could potentially support liability of the City under § 1983.  (See Order on Mot. Dismiss, Doc. 45).

[2] Pruitt has filed a combined Response (Doc. 50) to the motions, and Defendants have filed a collective Reply (Doc. 53).

I. Background

In the early evening of March 11, 2012, twenty-seven-year-old Pruitt and a female friend, Jasmine Shipley,[3] drove to downtown Orlando. After parking Shipley's car on the fourth floor of a parking garage on Central Avenue at 7:30 or 8:00 p.m., they visited several bars. Including a beer consumed before arriving downtown, Pruitt and Shipley each had six or seven drinks over the course of the evening. (Pruitt Dep. at 58-59; Shipley Dep. at 24). It is undisputed that Shipley became quite intoxicated, and the last bar the two visited refused to serve her any more alcohol. (Pruitt Dep. at 64; Shipley Dep. at 22, 26, 27).

At around 10:45, Pruitt and Shipley made their way back to the parking garage. They took the elevator to the fourth floor, and when they arrived there Shipley's tube-top dress was pulled down, exposing her black strapless bra.[4] (Pruitt Dep. at 68-69). Shipley does not recall how her dress became pulled down, (Shipley Dep. at 30-31); Pruitt testified in his deposition that Shipley, whom he described as "a silly drunk," pulled it down while they were in the elevator, (Pruitt Dep. at 63, 67-68).

When they reached Shipley's car, Shipley—still with the top of her dress down—lay down on the floor of the parking garage behind the car. (Id. at 67, 72, 76). About fifteen seconds after Shipley lay down, and as Pruitt was urging her to get up, three Orlando Police Department bicycle officers—Defendants Cote and Montfort and non-Defendant Officer

---

[3]Pruitt and Shipley had been friends for nine or ten years prior to the events at issue in this case, and both denied any romantic involvement with one another. (See Pruitt Dep. at 50; Shipley Dep. at 7, 19-20).

[4]The officers assert that Shipley's breast was also partially exposed, but Pruitt denies this. (Pruitt Dep. at 72).

Adkins—rode up the garage ramp on patrol and encountered Shipley lying there, with Pruitt next to her. (Id. at 72, 76). Pruitt claims that he was standing next to Shipley holding her arm trying to help her up; the officers assert that Pruitt was on the ground hovering over Shipley, "rubbing her chest bone." (Id. at 76, 81; Montfort Dep. at 10, 23; Cote Dep. at 11).[5] Once Shipley saw the police officers, she stood up. (Pruitt Dep. at 78).

Concerned that Shipley was being assaulted or battered by Pruitt, the officers asked what was going on and told Pruitt to move to the side, separating him from Shipley. (Id. at 83-84; Cote Dep. at 50; Montfort Dep. at 34; Shipley Dep. at 37). Officer Adkins went to get one of the parking garage security guards, and he did not witness or have any involvement in the remaining events. (Cote Dep. at 30; Montfort Dep. at 14). According to Cote, Shipley was "very irate and hostile," and the officers were not able to maintain a dialogue with her or obtain any useful information from her. (Cote Dep. at 13-14; Montfort Dep. at 14).

As the officers were attempting to communicate with Shipley, Montfort told Pruitt to sit down, and Pruitt complied. (Pruitt Dep. at 86; Montfort Dep. at 16). After sitting for three or four minutes, however, Pruitt stood up and told the officers his back was hurting and that he could not sit on the ground. (Pruitt Dep. at 86-88; Cote Dep. at 51; Montfort Dep. at 18). Montfort told Pruitt to sit back down, but Pruitt told him he could not sit because he had a bad back. (Pruitt Dep. at 88; Cote Dep. at 16). Montfort told Pruitt two or three times to sit back down, and when Pruitt did not comply Montfort and Cote approached Pruitt and pinned

---

[5]Cote described Shipley as unconscious when they first arrived. (Cote Dep. at 12). Pruitt denied that she was ever unconscious. (Pruitt Dep. at 72).

him up against a car. (Pruitt Dep. at 89). Cote and Montfort began to arrest Pruitt[6]; one officer grabbed Pruitt's right wrist and the other grabbed his left. (Id. at 90; Cote Dep. at 19).

According to Cote, Pruitt tensed up and pulled away, (Cote Dep. at 20), and Pruitt agrees that he may have tensed up and may have pulled his wrist back, though he denies "pulling away," which he says was not possible because he was pinned up against the car, (Pruitt Dep. at 90-91). With Pruitt up against the car, Cote then hit Pruitt on the upper left thigh three times with his baton. (Id. at 92-93, 95; Cote Dep. at 23). According to Cote, Cote was not holding Pruitt when he hit him, but Montfort still was. (Cote Dep. at 26). One of Cote's swings missed Pruitt's leg and hit Montfort on the inside of the knee.[7] (Pruitt Dep. at 92; Montfort Dep. at 29; Cote Dep. at 23-24).

The "next thing [Pruitt] kn[e]w," Cote shot him in the neck with his taser. (Pruitt Dep. at 95). These events happened in a rapid sequence. (Id.). Cote did not say anything before using the taser. (Id. at 95-96). After being hit with the taser, Pruitt fell to the ground. (Id.). The officers then handcuffed Pruitt, arrested him for resisting without violence, and took him to jail. (Id. at 96-97). Montfort went to a hospital due to swelling, an abrasion, and bruising on his leg from being struck by Cote's baton. (Cote Dep. at 35; Montfort Dep. at 29). Pruitt's face was scratched in the fall, and he also suffered a cut on his knee; both of

---

[6]Both officers testified in their depositions that Montfort told Pruitt at that point that he was under arrest, though he did not tell him what he was being arrested for. (Montfort Dep. at 20, 28; Cote Dep. at 19).

[7]The officers claim that Pruitt moved his leg and that that is why Cote accidentally hit Montfort. Pruitt denies moving his leg and claims it was "impossible" for him to have moved his leg. (Pruitt Dep. at 92).

these injuries healed without scarring. (Pruitt Dep. at 113-14). He also had minor bleeding from the taser prongs. (Cote Dep. at 35). Pruitt also claims to have suffered a permanent lower back injury from the incident.[8] (Pruitt Dep. at 117).

Pruitt filed this lawsuit on July 6, 2012. (Doc. 1). In the Third Amended Complaint, Pruitt alleges eight counts: claims of Fourth Amendment violations against Montfort (Count I) and Cote (Count II); claims of due process and equal protection violations under the Fourteenth Amendment against Montfort (Count III) and Cote (Count IV); claims of failure to protect against Montfort (Count V) and Cote (Count VI); and state law claims of battery (Count VII) and false arrest (Count VIII) against Cote only. Defendants seek summary judgment on all claims.

## II.  Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than

---

[8]It is not clear whether Pruitt is contending that the back injury was caused by sitting on the floor of the parking garage for four minutes or from falling after being tased. Pruitt explained in his deposition that he had suffered from back pain for four years prior to this incident, but that pain was in his upper and mid-back rather than his lower back. (Pruitt Dep. at 20, 23-24).

mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986)).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Sawyer, 243 F. Supp. 2d at 1263 (quoting Anderson, 477 U.S. at 251-52).

### III. Discussion

#### A. Counts III and IV—Due Process and Equal Protection

In Counts III and IV, Pruitt alleges that Montfort and Cote, respectively, violated his rights to due process and equal protection under the Fourteenth Amendment. Pruitt does not elaborate on the basis for these claims, nor has he responded to Defendants' arguments that they fail as a matter of law.[9] Pruitt's claims of unlawful arrest and excessive force arise

---

[9]Neither Cote nor Montfort filed a motion to dismiss these or any counts of the Third Amended Complaint.

under the Fourth Amendment's proscription against unreasonable seizures—made applicable to the states by the Fourteenth Amendment—not under the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment. See Graham v. Connor, 490 U.S. 386, 395 (1989) (holding that "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment" (emphasis removed)). Pruitt has alleged claims of unreasonable seizure under the Fourth Amendment in Counts I and II. Defendants are entitled to summary judgment on Counts III and IV.

### B. Counts I and II—Fourth Amendment

On Pruitt's Fourth Amendment claims, Defendants assert entitlement to the defense of qualified immunity, which "protects municipal officers from liability in § 1983 actions as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "To receive qualified immunity, the officer must first show that he acted within his discretionary authority." Id. In the case at bar, the officers were acting within their discretionary authority, and thus Pruitt has the burden of showing that qualified immunity should not apply. Id.

In determining whether officers enjoy qualified immunity, courts typically employ a two-part process, determining "whether the officer's conduct amounted to a constitutional violation" and "whether the right violated was 'clearly established' at the time of the violation." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). The Saucier opinion directed that

the two steps of analysis be conducted in order, but, as noted in Lewis, the Supreme Court has since "clarified . . . that the order of the inquiry is fluid, providing the Court with the flexibility to focus on the determinative question." Id. (citing Pearson v. Callahan, 555 U.S. 223 (2009)).  In other words, it is now permissible but "not mandated that the Court examine the potential constitutional violation under Saucier step one prior to analyzing whether the right was clearly established under step two." Id. (citing Pearson).

Both an unlawful arrest and the use of excessive force in effectuating even a lawful arrest constitute unreasonable seizures under the Fourth Amendment.  Pruitt asserts both of these types of Fourth Amendment violations.

1.  Arrest

"'In Fourth Amendment terminology, an arrest is a seizure of the person, and the 'reasonableness' of an arrest is, in turn, determined by the presence or absence of probable cause for the arrest.'" Bates v. Harvey, 518 F.3d 1233, 1239 (11th Cir. 2008) (quoting Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007)).  A law enforcement officer has probable cause to arrest when the facts and circumstances of which he is aware are "'sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.'" Skop, 485 F.3d at 1137 (quoting United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002)).  Probable cause is assessed based on the totality of the circumstances. See id.

Because of the protection afforded by qualified immunity, however, even if probable cause is lacking a law enforcement officer will not be personally liable for the arrest if the officer's judgment that probable cause existed was reasonable albeit mistaken. Id. The true

test is "whether 'reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendant[] could have believed that probable cause existed to arrest.'" Id. (quoting Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002)) (emphasis omitted). "Thus, to establish a constitutional violation in a § 1983 false arrest claim, the plaintiff ordinarily must prove that the officer arrested h[im] without at least arguable probable cause to believe []he had committed or was committing a crime." Bates, 518 F.3d at 1239.

"Whether an arresting officer possesses probable cause or arguable probable cause naturally depends on the elements of the alleged crime." Skop, 485 F.3d at 1137 (citing Crosby v. Monroe Cnty., 394 F.3d 1328, 1333 (11th Cir. 2004)). Here, Pruitt was arrested for violating section 843.02, Florida Statutes—"Resisting officer without violence to his or her person." This statute provides that it is a first-degree misdemeanor for anyone to "resist, obstruct, or oppose any [law enforcement officer] . . . in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer." The elements of the offense are thus (1) that the officer was "engaged in the lawful execution of a legal duty" and (2) that the accused's "action constitute[d] obstruction or resistance of that lawful duty." H.H. v. State, 775 So. 2d 397, 398 (Fla. 4th DCA 2000).

Defendants were engaged in the lawful execution of a legal duty during their encounter with Pruitt. Legal duties within the meaning of section 843.02 include, among others, legally detaining someone. See, e.g., C.W. v. State, 76 So. 3d 1093, 1095 (Fla. 3d DCA 2011). "A stop and/or brief detention of a person for investigatory purposes is permissible if an officer has a well-founded suspicion (supported by articulable facts) of criminal activity, even if the officer lacks probable cause." Huffman v. State, 937 So. 2d 202,

206 (Fla. 1st DCA 2006).

After happening upon Pruitt and Shipley in the parking garage in suspicious circumstances, Defendants lawfully detained Pruitt temporarily as part of an investigatory stop supported by reasonable suspicion. Indeed, Pruitt, his expert witness, and Shipley all readily acknowledged in their depositions that the circumstances were suspicious and warranted an investigation as to whether Shipley was possibly the victim of a battery or assault. (See Pruitt Dep. at 81-83; Lacey Dep. at 23, 44; Shipley Dep. at 37).

Moreover, "[t]he right to make an . . . investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. With regard to the obstructing or resisting element, Pruitt does not dispute that although he initially sat down, after a few minutes he stood up and then did not heed Montfort's repeated instructions to sit back down. (See, e.g., Pruitt Dep. at 89 (acknowledging that before he was arrested, Montfort asked him two or three times to sit back down)). Under Eleventh Circuit precedent, Pruitt's refusal to respond to repeated directives to sit down during the investigatory stop supports not just arguable probable cause but actual probable cause to arrest Pruitt for the offense of resisting or obstructing an officer under section 843.02. See Zivojinovich v. Barner, 525 F.3d 1059, 1071-72 (11th Cir. 2008) (concluding that deputies had probable cause to arrest the plaintiff for resisting without violence where deputies told him to sit and he sat "for a moment, but then he stood up again"). The Zivojinovich court relied on N.H. v. State, 890 So. 2d 514 (Fla. 3d DCA 2005), in which a Florida appellate court held that a juvenile defendant's refusal to sit down, refusal to identify himself, and physical threats to officers supported the trial court's finding of

obstruction or resistance of the officers' legal duty under section 843.02. The Eleventh Circuit noted that although the Zivojinovich actions "were not as egregious as those of the defendant in N.H., the standard for probable cause is significantly lower than the proof-beyond-a-reasonable-doubt standard applied to convictions." Zivojinovich, 525 F.3d at 1072.

Under Zivojinovich, the officers had probable cause to arrest Pruitt for resisting without violence. Because both actual and arguable probable cause existed for Pruitt's arrest, Montfort and Cote enjoy qualified immunity on the unlawful arrest component of Counts I and II.

### 2. Excessive Force

Pruitt also contends in Counts I and II that Defendants used excessive force in arresting him. Defendants are entitled to summary judgment on these claims.

"[S]ome use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense." Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003). "Because a police officer is entitled to use some force to arrest a suspect, 'the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment.'" Myers v. Bowman, 713 F.3d 1319, 1327 (11th Cir. 2013) (quoting Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000)). Pruitt has not identified any actions of Montfort that constitute more than de minimis force. Accordingly, Pruitt's excessive force claim against Montfort fails.

Unlike Montfort, however, Cote hit Pruitt with his baton and deployed his taser on Pruitt. These actions require further analysis.

"'In order to determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force was necessary in the situation at hand.'" Zivojinovich, 525 F.3d at 1072 (quoting Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002)) (further internal quotation omitted).  This question "must be decided 'on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Id. (quoting Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993)).

"A court looks to the 'totality of the circumstances' to determine whether the manner of arrest was reasonable." Draper v. Reynolds, 369 F.3d 1270, 1277 (11th Cir. 2004).  "[I]n determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Lee, 284 F.3d at 1198 (citing Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir. 1986)).

### a.  Need for the Application of Force

With regard to the need for application of force, factors to be considered include "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Davis v. Williams, 451 F.3d 759, 767 (11th Cir. 2006) (quoting Thornton v. City of Macon, 132 F.3d 1395, 1400 (11th Cir. 2006)).

*i. The Severity of the Crime at Issue*

Pruitt was arrested for resisting an officer without violence, which has been characterized as not a serious offense.  See Fils v. City of Aventura, 647 F.3d 1272, 1288

(11th Cir. 2011) (noting that "resisting arrest without force does not connote a level of dangerousness that would justify a greater use of force"). Cote, however, identifies battery and sexual assault—the suspected potential crimes that led to Pruitt's temporary detention—as the crimes at issue. The Court agrees that in some sense those crimes are also relevant to the analysis, and this raises the level of severity above the usual low level that would exist in a resisting case that does not involve reasonably suspected other crimes.

   *ii. Immediate Threat to Safety*

Next, Cote contends that Pruitt posed an immediate threat to the safety of the officers and others, asserting that there is always "a significant threat of physical violence" whenever there is a suspected battery or sexual assault and a suspect who ignores lawful commands. (Doc. 48 at 14). Cote further asserts that it was "reasonable to believe that physical violence could erupt" because there was an "emotional investigation" involving "highly intoxicated" parties. (Id.).

The Court cannot agree with these generalized conclusions. Pruitt has testified that he was pinned against a car by two police officers who were much larger than he was,[10] and the officers' investigation—rather than being "emotional"—was going nowhere. Additionally, while all agree that Shipley was "highly intoxicated," the evidence is less clear as to Pruitt's level of intoxication. The Court cannot conclude on this record that at the time of the

---

[10]At the time of the incident, Pruitt stood five feet eight inches tall and weighed one hundred fifty pounds. (Id. at 128; Cote Dep. at 20). Cote was six foot three inches tall and weighed between two hundred forty and two hundred fifty pounds, and Montfort was six foot four inches tall and weighed between one hundred ninety and two hundred pounds. (Cote Dep. at 5; Montfort Dep. at 2).

application of force Pruitt posed a serious and immediate threat to the safety of the officers or others, though his intoxication and prior noncompliance are not irrelevant.

### iii. Active Resistance to Arrest or Attempting to Evade Arrest By Flight

Although Pruitt was not attempting to evade arrest by flight at the time of Cote's application of force, Pruitt admits that when the officers grabbed his wrists, he may have tensed up and may have tried to pull his wrist away. (Pruitt Dep. at 90-91). The officers testified that Pruitt's actions were preventing them from handcuffing him and effecting the arrest. (Cote Dep. at 24; Montfort at 26-28).

### iv. Conclusion as to Need for the Application of Force

Considering these three factors, there was some need for application of force to effectuate Pruitt's arrest. Pruitt tensed up and tried to pull away, and this hindered the officers in handcuffing Pruitt. Although Pruitt was not a clear threat to the safety of the officers or others, his resistance to being handcuffed could have led to his own injury or injury to the officers if he had continued to struggle, and officers are permitted to use some force during an arrest, especially when a suspect is not being cooperative.

### b. Relationship Between the Need and the Amount of Force Used

Given Pruitt's noncompliance with the officers' attempts to arrest him, the officers felt it necessary to apply some force to get Pruitt to cooperate. When the baton had no effect on Pruitt, Cote employed his taser, after which the officers were able to subdue Pruitt. Without this application of force, Pruitt could have continued to struggle with the officers and could possibly have suffered greater injury. The amount of force used was not disproportionate to the need for the application of force under the circumstances.

### c. Extent of the Injury Inflicted

Pruitt's injuries were—except for possibly his back problem, which he claims was exacerbated by the incident—minor. He suffered only minor cuts and scratches that healed without scarring. The extent of Pruitt's back issue and the extent to which it was made worse by the incident are not clear on this record,[11] but the Court cannot conclude that Pruitt suffered significant injury from being hit three times on the thigh with a baton and being tased.

### d. Conclusion as to Reasonableness of Force

Even under Pruitt's version of the facts, the Court cannot conclude that Cote's use of force was unreasonable as a matter of law. As discussed earlier, there was probable cause to arrest Pruitt, and at the time of the application of the force Pruitt had not yet been handcuffed. "[T]he right to make an arrest 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" Draper, 369 F.3d at 1278 (quoting Graham, 490 U.S. at 396). In light of Pruitt's tensing up and attempt to pull his wrist away from the officers—which he does not deny—the force used here was a reasonable attempt to subdue him. Moreover, Pruitt did not suffer significant injury. Cf. id. ("Although being struck by a taser gun is an unpleasant experience, the amount of force [the officer] used—a single use of the taser gun causing a one-time shocking—was reasonably proportionate to the need for force and did not inflict any serious injury.").

Furthermore, even if the Court had found a triable issue remaining as to whether the

---

[11]As earlier noted, Pruitt has not explained what actions of Cote led to the back injury.

-15-

force employed was unreasonable, Cote would still be entitled to qualified immunity because it was not clearly established that it was unreasonable to use that amount of force in these circumstances. Cote's motion for summary judgment is granted on the excessive force component of Count IV.

### C. Counts V and VI—Failure to Protect

In Counts V and VI of the Third Amended Complaint, Pruitt brings claims against Montfort and Cote, respectively, for failure to protect Pruitt from the other officer's violation of constitutional rights.

#### 1. Montfort (Count V)

Pruitt alleges that "Montfort watched Cote violate Pruitt's . . . constitutional rights as he struck Pruitt in his legs with his [baton] and he shot Pruitt with his t[]aser; nevertheless, he willfully and intentionally refused to inform Cote that he was violating Pruitt's constitutional rights and he refused to intercede on Pruitt's behalf in order to protect Pruitt from Cote's violation of his constitutional rights." (Third Am. Compl. ¶ 43). Montfort is entitled to summary judgment on this claim.

"[A]n officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000). "This liability, however, only arises when the officer is in a position to intervene and fails to do so." Id. All of the accounts of this incident—including Pruitt's—indicate that the events happened quickly, and there is no indication that Montfort had an opportunity to intervene in Cote's applications of force to Pruitt. Cote hit Pruitt with his baton—accidentally hitting Montfort with the baton in the process—and then immediately tased Pruitt. Under these

circumstances, and assuming arguendo that Cote applied excessive force—a contention that the Court has already rejected—it cannot be said that Montfort was in a position to intervene. See Brown v. City of Huntsville, 608 F.3d 724, 740 n.25 (11th Cir. 2010) ("Because the relevant events happened so quickly, the record does not reflect any point at which [first officer] could have intervened to prevent [second officer's] use of force . . . . [First officer] accordingly is not liable for failure to intervene . . . ."). Montfort's motion for summary judgment shall be granted on Count V.

### 2. Cote (Count VI)

In Count VI, Pruitt alleges that "[a]lthough Cote had personal knowledge of the fact Pruitt had not committed any act that would cause a reasonable law enforcement officer to believe Pruitt had committed any crime, Cote willfully and intentionally refused to inform Montfort that he was violating Pruitt's constitutional rights." (Third Am. Compl. ¶ 47). Cote is entitled to summary judgment on this claim.

To the extent this claim is based on application of force by Montfort, Pruitt has not presented evidence of more than de minimis force, and Cote can not be held liable for failing to intervene to prevent a constitutionally permissible level of force. And, to the extent this claim is based on Montfort's initiation of an arrest of Pruitt for resisting, the claim fails for at least two reasons. First, the Court has found that probable cause existed for that arrest and that therefore the arrest did not violate the Constitution. Second, even if the arrest were improper, Pruitt has not presented authority for the proposition that an officer can be held liable for failure to intervene in an unlawful arrest.

Although it is clearly established that failure to intervene in application of excessive

force can result in liability for an officer, such is not the case for failure to intervene in other constitutional violations, including an arrest without probable cause. Cf. Jones v. Cannon, 174 F.3d 1271, 1286 (11th Cir. 1999) (holding that it was not clearly established "that once a police officer knows another officer has fabricated a confession in a police report for a warrantless arrest, that police officer has a constitutional duty to intervene to stop the other officer's conduct"); Livers v. Schenck, 700 F.3d 340, 360 (8th Cir. 2012) (noting that "other circuits have recognized a duty to intervene outside of the excessive force context" but that in Jones "the Eleventh Circuit refused to find a clearly established duty to intervene to stop other constitutional violations"); Mehta v. Foskey, 877 F. Supp. 2d 1367, 1380 (S.D. Ga. 2012) ("Plaintiffs have pointed to no controlling authority that requires a law enforcement officer to intervene to prevent another officer from performing an unlawful arrest.").[12] Cote's motion for summary judgment shall be granted on Count VI.

### D.  Counts VII and VIII—Battery and False Arrest

The final two counts of the Third Amended Complaint are state law claims of battery and false arrest. These claims are brought against only Cote.

---

[12]The Mehta and Livers courts mentioned an unpublished Eleventh Circuit decision, Lepone-Dempsey v. Carroll Cnty. Comm'rs, 159 F. App'x 916 (11th Cir. 2005), but concluded that that case did not clearly establish such a right. Lepone-Dempsey involved an excessive force claim that was based on the unlawfulness of the arrest, and the plaintiff also brought a failure to intervene claim. The court noted that "[o]ur precedent suggests . . . that the duty to intervene does not necessarily extend to every conceivable situation involving a constitutional violation" and then concluded that because "a claim of excessive force predicated on the unlawfulness of an arrest is subsumed into an unlawful arrest claim . . . the district court [did not err] in concluding that a duty to intervene in an unlawful arrest was clearly established." Id. at 920. This Court agrees with Mehta and Livers that Lepone-Dempsey did not clearly establish a duty to intervene in an unlawful arrest. See Livers, 700 F.3d at 360 n.13.

#### 1. Battery (Count VII)

"If excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery." City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996); accord Davis, 451 F.3d at 768. "Traditionally, a presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is clearly excessive." Sanders, 672 So. 2d at 47. "A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." Id.

Pruitt's state law battery claim against Cote fails for the same reasons that his Fourth Amendment excessive force claim fails. Even on the facts as described by Pruitt, the Court cannot conclude that Cote's use of force was unreasonable under the circumstances. Additionally, the circumstances described do not support a finding of bad faith, malicious purpose, or wanton and willful disregard of human rights by Cote as required for individual liability under state law. See § 768.28(9)(a), Fla. Stat. (providing that "[n]o officer, employee, or agent of the state or any of its subdivisions shall be held personally liable in tort . . . for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property"). Pruitt's motion for summary judgment shall be granted on Count VII.

#### 2. False Arrest (Count VIII)

Probable cause is an affirmative defense to a state law claim of false arrest. See City

of St. Petersburg v. Austrino, 898 So. 2d 955, 957 (Fla. 2d DCA 2005). As discussed earlier, probable cause existed for the arrest of Pruitt for resisting an officer. Cote is therefore entitled to summary judgment on Count VIII.

### IV. Conclusion

In sum, while Pruitt was understandably upset by Defendants' treatment of him, under controlling law Defendants' actions do not rise to the level of constitutional violations or state law torts. Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. The Motion for Summary Judgment (Doc. 48) filed by the Defendant Douglas Cote is **GRANTED** as to all claims against this Defendant.

2. The Motion for Summary Judgment (Doc. 49) filed by Defendant David Montfort is **GRANTED** as to all claims against this Defendant.

3. Defendants' Motion in Limine (Doc. 54) is **DENIED as moot**.

4. The Clerk is directed to enter a judgment providing that Plaintiff takes nothing on any of his claims against Defendants. Thereafter, the Clerk shall close this case.

**DONE** and **ORDERED** in Orlando, Florida this 30th day of August, 2013.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record